**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ERIC FRANKLIN,**

      **Petitioner,**                **CASE NO. 2:09-CV-891**
                                      **JUDGE MICHAEL H. WATSON**
**v.**                          **MAGISTRATE JUDGE E.A. PRESTON DEAVERS**

**WANZA JACKSON, WARDEN,**

      **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the instant petition, Respondent's Return of Writ, Petitioner's Reply, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

## FACTS and PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> The charges against him arise from the murders of Ricky Palmer and Denise Evans in their home on Dawnlight Avenue in Columbus, Ohio. The victims were found face-down in their kitchen, hands duct-taped behind them, and with tape across their eyes. Each had been killed by multiple gunshot wounds to the head and back.
>
> The Franklin County Grand Jury indicted appellant on two counts of aggravated murder with capital and firearm specifications and two counts of kidnapping. Appellant waived his right to a jury trial and was accordingly tried before a three-judge panel. The judges eventually returned a verdict of not guilty on the aggravated murder charges, but guilty of two counts of the lesser-included offense of murder with a firearm specification. Appellant was also convicted of two counts of kidnapping as charged. The court imposed a sentence of 15 years to life on each count of murder, to be served

consecutively to each other, and ten years on each of the two counts of kidnapping, to be served consecutively to each other but concurrently with the murder sentences. Neither the verdict forms nor the judgment entry specify which subsection of Ohio's murder statute, R.C. 2903.02, applies to appellant's conviction

***

[G]eneral testimony established that the victims were found, bound and bloodied, on their kitchen floor by their teenage daughter on her return from school. Because of the severity of the victims' wounds paramedics from the Columbus Division of Fire pronounced the victims dead at the scene. Police officers secured the scene and described the area around the bodies as extremely bloody. The rest of the house had been ransacked as if in a burglary. Investigators were unable to recover any useful fingerprint or DNA evidence, and the investigation did not progress until Columbus police and federal agents were able some time later to elicit incriminating statements from appellant and another suspect while they were incarcerated for other crimes.

The principal witness for the prosecution was Paul Hodge, who admitted that he had been involved in the crimes and that he had received a plea deal to testify against appellant and third participant, Edward "Ed" Hodge. (The record elsewhere indicates that the two Hodges are not related by blood or marriage.) In exchange for his testimony, Paul Hodge was allowed to plead to reduced charges of involuntary manslaughter, receiving a sentence of 16 years to be served in federal prison in conjunction with sentences imposed for other crimes.

Paul Hodge testified that he has known Ed Hodge since the 1980s, and associated with him frequently. Paul Hodge stated that he had similarly known appellant for some time, first meeting him when the two served time in federal prison beginning in 1998. Paul Hodge considered appellant his best friend, and the two had agreed that if Paul Hodge uncovered a truly lucrative robbery opportunity he would contact appellant.

Paul Hodge testified that on March 12, 2002, Ed Hodge contacted him and proposed a robbery that would net them $300,000. Ed Hodge

2

was friendly with the proposed robbery victim, Ricky Palmer, and expected that as a drug dealer Palmer would have large amounts of cash in his home. Paul Hodge then contacted appellant, who lived in West Virginia, and offered him the opportunity to participate in the robbery. On the morning of March 13, 2002, the three men gathered to execute their plan. Ed Hodge, because he knew Palmer, would go in first to introduce appellant and Paul Hodge as New York drug dealers who would sell Palmer a large quantity of marijuana. Paul Hodge and appellant would then rob Palmer and pretend to rob Ed Hodge, leaving Ed Hodge, the only participant personally known to Palmer, as an apparent innocent victim of a double cross by the "New York drug dealers." All three anticipated that Palmer would be home alone. They prepared a shoebox full of "bait" marijuana to further the initial deception, and Ed Hodge procured some duct tape to bind the victim.

When the three men arrived at the Palmer house, Ed Hodge approached the door first, leaving his cell phone on so that the other two would be able to hear his conversation with Palmer. Palmer first allowed Ed Hodge, and then his two accomplices, into the home. All three were armed, Paul Hodge with a 9 mm semiautomatic, appellant and Ed Hodge with .38 revolvers. According to Paul Hodge's version of events, the three robbers did not for any time maintain the deception that Ed Hodge was only an unknowing intermediary, because Ed Hodge from the outset appears to have participated in subduing Palmer.

Appellant and Paul Hodge confronted Palmer at gunpoint, and forced him to lie on the floor, whereupon they bound him with duct tape with his hands behind his back, and placed tape over his eyes. At this time, both appellant and Paul Hodge were surprised to see Ed Hodge re-enter the room with Denise Evans, whom Ed Hodge proceeded to bind with duct tape in a similar manner. Paul Hodge was upset and disappointed with this development because of Ed Hodge's prior assurance that Palmer would be home alone. Paul Hodge felt personally betrayed by Ed Hodge over the presence of this additional complication.

The three robbers then spread out through the house seeking valuables. Appellant located a small safe, and Paul Hodge opened it with a knife. They found a handgun, some minor collectibles, and a small quantity of cash. The large payoff promised by Ed Hodge did

3

not materialize. At some point during the search of the home, Paul Hodge heard water running in the bathroom and observed that Ed Hodge had wet a green bath towel and was carrying it with him.

Paul Hodge specifically testified that when he left the house Ricky Palmer and Denise Evans were alive and unharmed other than being duct-taped and restrained. Neither had been beaten or otherwise injured. Paul Hodge and appellant carried a bottle of liquor and the other meager proceeds of the robbery out to the car. Appellant alone then made two more trips into the house to remove more items. Eventually appellant sat in the car with Paul Hodge where they waited for Ed Hodge, who had remained in the house throughout, to emerge. After about ten minutes, Ed Hodge appeared, made two trips from the house with other minor personal items, and went back in. After this, while appellant and Paul Hodge were sitting alone in the car, they heard muted "tapping" sounds from the house, not very loud. Ed Hodge then came out of the house drinking a soda and got in the car.

They then drove to Ed Hodge's apartment in New Albany. When they got there, Ed Hodge told the others to take off their shoes and clothing, providing them with replacement clothes. Paul Hodge took a shower. They unloaded all of the merchandise and valuables taken from Palmer and Evans' house, and ascertained that they had netted a digital camera, a DVD player, a laptop computer, a video game player, some alcohol, a quantity of coins, a safe, and a .32 pistol with some ammunition. They had also obtained about a pound of marijuana, above the amount that they had taken in as "bait."

Ed Hodge put their clothing in a trash bag for disposal, including their shoes. He gave appellant the .38 revolver that Ed Hodge employed in the robbery, and told appellant to get rid of it on his way back to West Virginia. They divided up the proceeds of the robbery, with appellant taking some jewelry and some of the marijuana. Appellant and Paul Hodge then left Ed Hodge's residence and went to Paul Hodge's mother's house, where appellant dropped off Paul Hodge and headed back to West Virginia. Paul Hodge testified that he was unaware of the murders until he saw television news coverage later in the day. He denied any prior knowledge of circumstances that might have motivated Ed Hodge to undertake the robbery with the specific intent of, or as a pretext for, killing Palmer. Specifically, he denied knowledge of a possible large drug debt owed by Ed Hodge

4

to Palmer.

The prosecution also presented the testimony of General Smith, who shared a prison cell with appellant in November of 2005. Smith recounted conversations with appellant about appellant's case, and stated that appellant had described the crime as a robbery that turned out bad. Appellant told Smith that he had never "murked" a woman before, but he "had to do what he had to do." (Tr., 184.) Smith testified that "murked" is a slang term for murder.

Appellant testified on his own behalf, largely corroborating the testimony of Paul Hodge. Appellant also heard, as they waited in the car for Ed Hodge to exit the home, muted "popping" noises from the house. (Tr., 225.) Appellant also remembered Ed Hodge wetting a towel and carrying it with him as they ransacked the house, the implication being that Ed Hodge used the wet towel as a silencer. Appellant also stated that his understanding of the initial plan for the robbery particularly stressed finding Ricky Palmer alone at home, that the presence of Denise Evans had been very disturbing to both Paul Hodge and appellant, and that neither Paul Hodge nor appellant at any time in their planning and discussion of the robbery had contemplated killing Palmer or anyone else. Appellant's testimony did vary from Paul Hodge's, however, in that appellant denied having a gun on his person at any time during the robbery, and stated that only Ed Hodge and Paul Hodge were armed. Appellant further testified that on his way back to West Virginia he threw the gun given him by Ed Hodge in the Kanawha River.

At the close of testimony, the state and defense entered into a series of stipulations, including an agreement that spent projectiles recovered at the scene were from a .38 caliber weapon, and that a green towel recovered at the scene bore traces of gunpowder.

*State v. Franklin*, No. 06-AP-1154, 2008 WL 324119, at *1-5 (Ohio App. 10th Dist. Feb. 7, 2008).

Represented by new counsel, Petitioner filed a timely appeal, in which he raised the following

assignments of error:

> First Assignment of Error
> Appellant's convictions for murder are not supported by sufficient
> evidence.

5

> Second Assignment of Error
>
> Appellant's convictions for murder are against the manifest weight of
> the evidence.
>
> Third Assignment of Error
>
> The trial court committed reversible error by overruling Appellant's
> motion to suppress.

*Id*. at *1. On February 7, 2008, the appellate court affirmed the judgment of the trial court.  *Id.*  On

August 6, 2008, the Ohio Supreme Court dismissed Petitioner's subsequent appeal.  *State v.*

*Franklin*, 119 Ohio St.3d 1409 (2008).   On April 25, 2008, Petitioner filed an application to reopen

his appeal pursuant to Ohio Appellate Rule 26(B).  He asserted as follows:

> Appellate counsel provides ineffective assistance of counsel contra
> the Sixth Amendment to the United States Constitution when counsel
> fails to raise the trial court's denial of appellant's due process rights
> under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the
> United States Constitution in failing to suppress evidence as the fruit
> of the poisonous tree where such evidence was the result of the
> exploitation of illegally obtained evidence.

*Exhibit 18 to Return of Writ*.  On July 10, 2008, the state appellate court denied Petitioner's Rule

26(B) application.  *Exhibit 20 to Return of Writ*.  On October 29, 2008, the Ohio Supreme Court

dismissed Petitioner's subsequent appeal.  *Exhibit 23 to Return of Writ.*

On October 8, 2009, Petitioner filed the instant *pro se* petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  He alleges that he is in the custody of the Respondent in violation of

the Constitution of the United States based upon the following grounds:

> 1.  Petitioner received constitutionally deficient appellate counsel
> contra the Sixth Amendment to the United States Constitution when
> counsel failed to raise the trial court's denial of Petitioner's due
> process rights under the Fourth, Fifth, Sixth and Fourteenth
> Amendments to the United States Constitution in failing to suppress

6

evidence as the fruit of the poisonous tree where such evidence was
the result of the exploitation of illegally obtained evidence.

2.  Petitioner received a constitutionally deficient trial contra the
Sixth Amendment to the United States Constitution when the trial
court committed reversible error by overruling Petitioner's motion to
suppress.

3.  There was insufficient evidence to sustain Petitioner's convictions
in violation of due process and the right to a fair trial contra the Sixth
and Fourteenth Amendments to the United States Constitution.

It is the position of the Respondent that Petitioner's claims are without merit.

## CLAIMS ONE AND TWO

These claims are related and will be considered together here.  In claim two, Petitioner
asserts that he was denied a fair trial because the trial court denied his motion to suppress all
evidence obtained as a result of his proffer statements to police.  Respondent contends that this claim
is waived because Petitioner failed to raise it on direct appeal as a federal constitutional issue and
therefore may not now do so in these proceedings.

In order to exhaust available state remedies, a petitioner must first fairly present the
substance of his federal habeas corpus claims to the state courts.  *Picard v. Connor,* 404 U.S. 270,
275 (1971); *Anderson v. Harless,* 459 U.S. 4, 6 (1982).  "The state courts must be provided with a
fair opportunity to apply controlling legal principles to the facts bearing upon petitioner's
constitutional claims." *Sampson v. Love,* 782 F.2d 53, 55 (6th Cir. 1986). Petitioner does not fairly
present his claim simply because the necessary facts supporting a federal constitutional claim are
present or because the constitutional claim appears self evident. *Haggins v. Warden,* 715 F.2d 1050,
1054 (6th Cir. 1983)(citing *Harless,* 459 U.S. at 6). Furthermore, "[a] petitioner 'fairly presents' his
claim to the state courts by citing a provision of the Constitution, federal decisions employing

constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns." *Levine v. Torvik,* 986 F.2d 1506, 1515 (6th Cir. 1993)(citing *Franklin v. Rose,* 811 F.2d 322, 326 (6th Cir. 1987)). Courts normally require more than a single broad generalization that petitioner was denied a "fair trial" or "due process of law." *Franklin,* 811 F.2d at 326; *Petrucelli v. Coombe,* 735 F.2d 684, 688 (6th Cir.1984). Petitioner, however, need not "cite book and verse on the federal constitution." *Picard,* 404 U.S. at 277 (quoting *Daugharty v. Gladden,* 257 F.2d 750, 758 (9th Cir. 1960)). The Sixth Circuit has strictly followed the requirement that a petitioner fairly present his or her federal constitutional claims to the state courts as a precondition to federal habeas review. *Weaver v. Foltz,* 888 F.2d 1097, 1098 (6th Cir.1989).

As noted by the Respondent, Petitioner argued on direct appeal that the trial court had committed reversible error in failing to grant his motion to suppress evidence because the prosecutor had violated his contract with Petitioner. *Exhibit 11 to Return of Writ.* Petitioner did not refer to the Constitution, nor did he refer to any federal cases or state cases relying on federal law in support of his claim.

As cause for his failure to raise claim two as a federal constitutional issue, and in claim one of his federal habeas corpus petition, Petitioner asserts ineffective assistance of appellate counsel. The state appellate court rejected this claim in relevant part as follows:

> Appellant's application for reopening asserts that his appellate counsel was ineffective for failing to argue that the prosecution was improperly allowed to use derivative evidence flowing from appellant's conversations with law enforcement officials connected to discussions surrounding a proffer letter. Appellant argues that this derivative evidence should have been suppressed as "fruit of the poisonous tree," *i.e.*, evidence flowing directly from a breach of appellant's constitutional rights.

8

During the investigation that preceded the formal charges against appellant, he was interviewed by several police jurisdictions including a federal agent with whom appellant had cooperated in the past.   During the course of an interview with Franklin County investigators and prosecutors, and in the presence of his attorney, appellant executed a proffer letter governing the use of any statements given by appellant in interviews governed by the proffer letter.  The principal terms were, first, that no use would be made at trial by the prosecution of any statements made or information directly given by appellant during the meetings, and second, that the prosecution could make derivative use of such information and pursue any investigative leads suggested by appellant's statements.

Under the fruit of the poisonous tree doctrine, a defendant is entitled to the suppression of derivative evidence obtained from a constitutional violation.  *Wong Sun v. United States* (1963), 371 U.S. 471. . . . The doctrine only operates to exclude derivative evidence that was discovered as the result of a constitutional violation.  *State v. Pearson* (1998), 130 Ohio App.3d 577.  The use of proffer letters to advance an investigation by allowing a suspect or witness to cooperate without running the risk of having his statements used directly against him in court does not violate any constitutional right. *See, e.g., United States v. Brothers* (M.D. Tenn. 1993), 856 F.Supp. 380; *United States v. Stein* (June 8, 2005), E.D. Pa. No. CR04-269-9. Where the defendant voluntarily agrees to all terms of the proffer letter, including the derivative use provision, and the government adheres to its obligation not to use the statements made directly by the defendant in discussions governed by the proffer letter, no constitutional violation has occurred and the derivative evidence gleamed by the investigators from the information provided during such proffer letter discussions is fully admissible.  *United States v. Riley* (Feb. 8, 2008), D.N.H. No. 07-189-GZS.

Because the arguments that appellant asserts his appellate counsel should have raised are in fact meritless, appellant cannot show ineffective assistance of appellate counsel.

*Exhibit 20 to Return of Writ.*  The state appellate court similarly rejected Petitioner's related claim on direct appeal as follows:

Appellant's third assignment of error asserts that the trial court erred in failing to suppress statements obtained from appellant in violation of the terms of a "proffer letter" entered into by appellant and prosecutors. This letter provided that no statements made by appellant during meetings in which appellant furthered the investigation of the Palmer/Evans murders would be used against him in criminal prosecution. On appeal, appellant fails to establish what statements, if any, should have been suppressed. The terms of the proffered letter specifically stated that the state would be fully entitled to make derivative use of any information that appellant shared; that is, if the investigation based upon appellant's statements turned up information incriminating to appellant, the state could use it to prosecute appellant. That is precisely what happened in this case. No statements by appellant during conversations connected with the proffered letter were admitted in court, and the state developed its case from circumstantial evidence and other witnesses. Appellant's third assignment of error is accordingly overruled.

*State v. Franklin*, 2008 WL 324119, at *7.

The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. §

2254(e)(1) provides:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court's decision was contrary to

or an unreasonable application of clearly established federal law, or based on an unreasonable

determination of the facts in light of the evidence that was presented. 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State

10

court proceedings unless the adjudication of the claim-

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Court of Appeals for the Sixth Circuit has summarized this standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from the Supreme Court's decisions but unreasonably applies it to the facts of the petitioner's case.

*Boykin v. Webb,* 541 F.3d 638, 642 (6th Cir. 2008)(quoting *Williams v. Taylor,* 529 U.S. 362 (2000)). Petitioner has failed to meet this standard here.

Petitioner appears to argue that the prosecutor violated the terms of the proffer agreement by bringing charges against him that resulted from information obtained under the proffer. Petitioner argues that under the terms of this agreement, he should have been granted immunity from any criminal prosecution that resulted from information contained in his proffer statement. *Traverse*, at 3.

This claim is plainly without merit. "Proffer agreements, like other types of 'informal immunity,' are contractual in nature." *United States v. Detore*, No. 4:01CR207, 2002 WL 1359692, at *2 (N.D. Ohio May 13, 2002)(citing *U.S. v. Orlando,* 281 F.3d 586, 594 (6th Cir. 2002); *U.S. v. Tapert,* 993 F.2d 1548, 3 (6th Cir. 1993); *U.S. v. Turner,* 936 F.2d 221, 223 (6th Cir. 1991); *U.S. v.*

*Chiu,* 109 F.3d 624, 625 (9th Cir. 1997); *U.S. v. Plummer,* 941 F.2d 799, 802 (9th Cir. 1991)). "Thus, '[t]he construction of proffer agreements . . . is governed generally by the principles of contract law.'" *Id.* (quoting *U.S. v. Pielago,* 135 F.3d 703, 709 (11th Cir. 1998)).

While the proffer agreement indicated that the government could not use any statements or information Petitioner provided during his proffer meeting in any criminal prosecution, the agreement also explicitly provided that the government could make derivative use of any information obtained from Petitioner and could pursue any investigative leads suggested by his statements or information he provided. *See Exhibit 11 to Return of Writ.* Therefore, Petitioner's proffer agreement granted him only "informal use immunity," not "informal derivative use immunity." *United States v. Detore*, 2002 WL 1359692, at *2.[1]  In view of this plain language, Petitioner's claim that the government was prohibited from making derivative use of the information he provided in filing the charges against him fails.  "The proffer agreement expressly permits the government to do just that." *Id.* at *3.

Claim one is without merit.

---

[1]  "Use immunity prevents the government from using the testimony of an immunized witness against the witness. Derivative use immunity, on the other hand, prevents the government from using evidence derived from the compelled testimony against the witness." *United States v. Detore*, 2002 WL 1359692, at *2 n.1.

# CLAIM THREE

In claim three, Petitioner asserts that the evidence was constitutionally insufficient to sustain his convictions. The state appellate court rejected this claim as follows:

> As to sufficiency of the evidence, "'sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Id.,* citing Black's Law Dictionary (6th Ed.1990) 1433. A determination as to whether the evidence is legally sufficient to sustain a verdict is a question of law.... The relevant inquiry on review of the sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S .Ct. 2781, 2789, 61 L.Ed.2d 560. A reversal based on insufficient evidence has the same effect as a not guilty verdict because such a determination "means that no rational fact finder could have voted to convict the defendant." *Tibbs v. Florida* (1982), 457 U.S. 31, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652.
>
> \*\*\*
>
> [A]ppellant argues solely that there was no credible evidence that appellant had the specific intent to cause or contribute to the deaths of Ricky Palmer and Denise Evans. Appellant particularly stresses the unreliable nature of the testimony of the jailhouse informant, General Smith, which appellant asserts is the sole evidence presented at trial that would support actual participation by appellant in the killings themselves.
>
> We first note that, pursuant to the standard of review presented above, we will be cautious in revisiting the credibility given by the judges of the trial court to the testimony of the jailhouse informant. Defense counsel at trial had full opportunity to cross-examine Smith on both his motives for testifying– Smith did not disagree with counsel's description of him as a "professional snitch"– and the circumstances and reliability of the statements allegedly made by appellant to Smith in their jailhouse conversations. Defense counsel was also able to extensively develop appellant's own testimony on the stand regarding the fact that Smith was well-known as an informant

13

in the inmate population, and that appellant, who had otherwise been relatively consistent in his version of events given during various police interrogations, would be unlikely to disclose anything more incriminating to a known informant. The trial court judges thus had ample information before them from which to develop an appreciation of Smith's credibility, and may have chosen to believe his testimony. We are not in a position to disturb that assessment on appeal of Smith's credibility, and even if appellant's conviction turned solely upon that testimony we would find no grounds for reversal.

We further find, moreover, that the murder convictions do not turn solely upon the testimony of this jailhouse informant, because the trial court panel could from the evidence before it find appellant guilty of felony murder due to his participation in the robberies and kidnapping that immediately preceded the actual shootings, even if appellant did not intend the shootings to occur.

Under R.C. 2903.02(A), the general offense of murder is defined as follows: "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy." Felony murder under R.C. 2902.02(B), however, omits the mens rea of "purposely": "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 [voluntary manslaughter] or 2903.04 [involuntary manslaughter] of the Revised Code." Aggravated robbery and kidnapping are offenses of violence as defined in R.C. 2901.01(A)(9)(a). The indictment charged appellant with kidnapping, and he was convicted of that crime. In finding felony murder, therefore, the question before the trial court would have been whether appellant caused the death of Ricky Palmer and Denise Evans as a proximate result of appellant's commission of the crime of kidnapping, or attempted commission of the crime of aggravated robbery.

In order for a criminal defendant's conduct to be the proximate cause of a fatal result in a felony murder case, the court must first determine whether the killings would not have occurred "but for" the defendant's conduct. The court must then determine whether the result varied greatly from the intended outcome or foreseeable result of the underlying crime, that is, "that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the

14

defendant criminally responsible for something so unforeseeable." *State v. Dixon,* Montgomery App. No. 18582, 2002-Ohio-541, citing LaFave & Scott, Criminal Law (1972), Section 35, 246. Foreseeability should be assessed from the viewpoint of what the defendant knew or should have known in light of ordinary experience. *State v. Lovelace* (1999), 137 Ohio App.3d 206, 216.

The evidence in the present case established that appellant, armed with a gun or at the very least in the company of two others armed with guns, set out to undertake the home invasion robbery of a known drug dealer, himself likely to be armed and ready to present resolute opposition. Appellant participated in subduing at gunpoint and duct taping at least one of the victims and in ransacking the premises in search of valuables. Appellant thereafter left the scene of the crime with his two companions and proceeded to divvy up the loot and dispose of the probable murder weapon.

The evidence as a whole in this case amply supports a conviction for felony murder, regardless of whether appellant entered the criminal enterprise with any personal intent of shooting his robbery victim or eliminating witnesses. It was reasonably foreseeable that once the robbery and home invasion progressed to the point where both the intended victim and his domestic partner, who was unexpectedly present, were subdued and bound at gunpoint, either of appellant's companions in crime might choose to conclusively end the matter and reduce the possibility of either apprehension by authorities or retribution by the victim by simply shooting the now-helpless occupants of the house. In fact, nothing in either appellant's or Paul Hodge's description of their respective criminal experience made this outcome unforeseeable, even if the court were to accept as sincere their repeated denials of intent or desire to kill in perpetuation of this particular robbery.

This court held similarly in the recent case of *State v. Hayes,* Franklin App. No. 06AP-290, 2007-Ohio-3056, on evidence rather less supportive of the prosecution's case. In *Hayes,* the defendant was, at least by his own account, only peripherally involved in a robbery that resulted in the murder of a gun shop owner. The defendant did not enter the business where the murder took place, but waited in the car for approximately 30 minutes. His defense not only to felony murder but to the underlying robbery charge was that he had never intended to participate in either, but had only gone along with the trigger man

and other robbers "for the ride." When his companions announced that they would rob the gun store, the defendant asked to be dropped off at home, was refused, and eventually chose to stay in the car to avoid a long walk. Testimony from other participants in the gun shop robbery was not available at trial to place the defendant at the scene, although police did recover some stolen items, as well as the murder weapon, from his home.

On these facts we found in *Hayes* that, even accepting the defendant's version of events, not only had the defendant sufficiently participated in the robbery to be charged with that crime, but that he could also be convicted of felony murder.

Based on the foregoing, we find that appellant could be convicted of murder both based upon the testimony of General Smith describing appellant's statements that he "did what he had to do" in murdering a woman during a robbery, supporting a conviction for purposely causing the death of another and thus murder under R.C. 2903.02(A), as well as a conviction for felony murder under R.C. 2903.02(B) due to appellant's admitted active participation in a home invasion robbery and kidnapping. Appellant's first and second assignments of error are overruled.

*State v. Franklin*, 2008 WL 324119, at *5-7.

As discussed by the state appellate court, before a criminal defendant can be convicted consistent with the United States Constitution, there must be sufficient evidence to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. *Wright v. West,* 505 U.S. 277, 296 (1992) (citing *Jackson,* at 319.) The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson,* at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume– even if it does not appear on the record– that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

16

resolution.' " *Id.* (quoting *Jackson,* at 326).

For the reasons detailed by the state appellate court, this Court likewise concludes that, when viewing all of the evidence in the light most favorable to the prosecution, *Jackson v. Virginia*, the evidence was constitutionally sufficient to sustain Petitioner's convictions.

**WHEREUPON**, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

## PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation,* that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability

17

should issue.

                                  _s/ *Elizabeth A. Preston Deavers*_____

                                  **ELIZABETH A. PRESTON DEAVERS**

                                  **UNITED STATES MAGISTRATE JUDGE**

Date:   January 18, 2011

18